IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STEVEN A. CARPENTER,

      Plaintiff,

    v.

OHIO HEALTH CORPORATION,

      Defendant.

Case No. 2:09-CV-965

JUDGE SARGUS

MAGISTRATE JUDGE KING

## OPINION AND ORDER

This matter is before the Court for consideration of the Parties' cross-motions for summary judgment (Docs. 37 and 38); Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Mitigation of Damages Affirmative Defense (Doc. 25); Plaintiff's Motion for Leave to File Supplemental Authority to Plaintiff's Motion for Summary Judgment (Doc. 40); and Plaintiff's Motion to Strike Affidavit of Emmalee Ponzio (Doc. 45). For the reasons stated herein, Plaintiff's motion to file supplemental authority is **GRANTED**; Defendant's motion for summary judgment is **GRANTED in PART** and **DENIED in PART**; Plaintiff's motion for summary judgment is **DENIED**; Plaintiff's motion to strike is **DENIED**; and Plaintiff's motion for summary judgment on the issue of mitigation of damages is **DENIED**.

### I.

Plaintiff Steven Carpenter brings the instant action against Ohio Health Corporation ("Ohio Health") with claims for disability discrimination and retaliation brought pursuant to Ohio's antidiscrimination statute, Ohio Revised Code, § 4112.01 *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and age discrimination brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA") and the Ohio antidiscrimination statute, Ohio Revised Code, § 4112.01 *et seq.* Carpenter, a former employee

of Ohio Health, claims that he was improperly terminated from his position in the radiology file room at Riverside Health Center ("RHC") when a back injury prevented him from hanging mammography films, a task Ohio Health deemed to be essential to his position. He also claims that he was impermissibly terminated because of his age.

**A.**

Carpenter began his employment as a clerk with Ohio Health at Riverside Hospital on December 5, 1994. (Carpenter Dep. 64.) He was promoted to the position of Clerical Specialist in September 1999. (Carpenter Dep. 64–65.) Carpenter initially worked in the main radiology department, but was transferred to RHC at around the time of his promotion. (Carpenter Dep. 66.) He remained at RHC until his employment with Ohio Health Ended in 2008. (Carpenter Dep. 66.)

In 2004, he was transferred to the file room in the radiology department at RHC and began working as an Imaging Service Specialist. (Carpenter Dep. 72.) At this time, he worked an evening shift, from 3:00 p.m. to 11:30 p.m. (Carpenter Dep. 79.) Carpenter worked in the file room with Joyce Burris, Joy Griffin, Deborah Reeves, Kim Savage, and Steve Black. (Burris Dep. 9–10.) His job duties as an Imaging Service Specialist included making lab runs, retrieving and distributing records, and mailing records. (Carpenter Dep. 76–77.)

Carpenter's disability claims center on the hanging of mammography films, which is a job task performed by employees in the RHC file room. According to Burris, hanging the films is done while seated in a chair, and essentially involves reaching onto a cart to pick up the films and reaching forward to hang the films. (*See* Burris Dep. 26–27.) Picking up films on the bottom of the cart requires bending. (Burris Dep. 26.) Griffin testified that she only required an hour or two of training to learn how to hang the films and that the skill is easily retained.

2

(Griffin Dep. 28–29.) Further, no prior training in hanging films was required before someone could be hired to work in the file room. (Buchele Dep. 63.)

Support Services Manager Carla Buchele became manager of the RHC file room in March 2007. (*See* Buchele Dep. 23.) Prior to Buchele taking over management of the RHC file room, Carpenter did not hang mammography films. (Carpenter Dep. 83.) According to him, he and his coworkers had reached an agreement allocating the job responsibilities, and, pursuant to this agreement, Carpenter would not hang the films because of his back injury, but would instead do other tasks. (Carpenter Dep. 213.) Carpenter acknowledged that the agreement was merely an informal arrangement among coworkers, and not an accommodation given to him by management. (Carpenter Dep. 213–14.) Burris testified that, during this time period, she hung the majority of the films, but Griffin, Savage, and Reeves also did them "on occasion." (Burris Dep. 15.)

Buchele also had oversight of Riverside's central file department, and restructured the positions at the RHC file room so that operations between the two locations would be consistent. (*See* Buchele Dep. 37.) Buchele also changed the position titles of Carpenter, Reeves, Burris, and Savage to "Radiology Section Coordinator," as that was the title used by employees in the central file department. (Buchele Dep. 42–43, Ex. FF.) According to Buchele, standardization of the operations between the RHC file room and the central file department required employees of the RHC file room to begin performing new job functions and to learn new processes. (Buchele Dep. 39–40.) Buchele also divided work in the RHC file room into discreet stations that employees would rotate through on a daily basis in order to gain experience in each of the required tasks. (*See* Buchele Dep. 52.) These stations were labeled "Notes," "phones,"

"scheduling," "processing," "PET," and "runner." (Buchele Dep. 53.) The "processing" station required the hanging of mammography films. (Buchele Dep. 56.)

After Buchele took over as manager, Carpenter's schedule was also changed to include the hours between 10:30 a.m. and 7 p.m. (Carpenter Dep. 80.) Buchele testified that she changed Carpenter's shift because there was typically more work to be performed during the adjusted time period than later in the evening. (*See* Buchele Dep. 65–66.) As his shift was the last scheduled shift of the day, Carpenter was designated a "closer" with specific tasks that needed to be accomplished by the close of business. (Buchele Dep. 125.) Joyce Burris also worked the same shift as Carpenter as a closer. (Buchele Dep. 125–26.) According to Buchele, as the closers were the only two individuals working in the file room past 5 p.m., they were required to hang mammography films that had not been hung prior to 5 p.m. (*See* Buchele Dep. 125.) A document titled "RHC Opener and Closers Checklist" states, inter alia, that the closer should hang all films by the end of the shift. (Buchele Dep. Ex. J.)

In the weeks prior to Buchele's assumption of management responsibilities over the file room, Carpenter began to see a chiropractor concerning some health issues he was experiencing. He had previously suffered a repetitive stress injury to his back while working for Pepsi Cola in 1991. (Carpenter Dep. 25.) His chiropractor at the time, Dr. Kevin Boltz, put him on a lifting restriction as a result of the injury. (Carpenter Dep. 27.)   On February 9, 2007, Carpenter visited Dr. Jerome Stetz, whom he had previously seen in the mid-1990s when Stetz worked in a practice with Dr. Boltz. (Carpenter Dep. 102.) According to Dr. Stetz, at this time, Carpenter complained of problems with his neck, upper back, and right shoulder and arm. (Stetz Dep. 17.) Dr. Stetz diagnosed Carpenter with a right shoulder strain/sprain, right shoulder bursitis, and segmental dysfunction in the cervicothoracic region. (Stetz Dep. 17.) He categorized

Carpenter's problems as occupational disease brought on by repetition of job duties. (Stetz Dep. 17–18.) As a result of his diagnosis, Dr. Stetz held Carpenter out of work from February 13, 2007 through February 28, 2007. (*See* Carpenter Dep. Ex. 7.) Carpenter also filed a workers' compensation claim signed by Dr. Stetz. (Carpenter Dep. Ex. 6.)

Carpenter returned to work on February 28, 2007 under restrictions put in place by Dr. Stetz. These restrictions were effective until March 14, 2007, and prevented Carpenter from pulling or replacing X-ray folders and lifting more than twenty pounds. (Stetz Dep. Ex. 5.) Carpenter also required leave to sit five minutes out of every hour. (Stetz Dep. Ex. 5.) As Ohio Health could not accommodate the restrictions imposed on Carpenter by Stetz, Carpenter was temporarily reassigned to a light duty position at Grant Medical Center, before transitioning back to his position at RHC on March 14th. (*See* Carpenter Dep. 119–20.)

Effective March 14th, Stetz lowered the restrictions to which Carpenter was subject. Per the revised restrictions, Carpenter was prevented from lifting over fifty pounds, could occasionally lift between thirty and fifty pounds, could frequently lift between twenty-one and thirty pounds, and could continuously lift between eleven and twenty pounds. (Stetz Dep. Ex. 6.) Further, Carpenter was permitted to frequently bend, squat, and reach, and continuously stand, walk, and sit. (Stetz Dep. Ex. 6.) Finally, Carpenter was required to change position from sitting or standing or vice versa five minutes out of every hour. (Stetz Dep. Ex. 6.) In defining these restrictions, Stetz used a form apparently supplied by Ohio Health that defined "Occasionally" as between 1% and 33%; "Frequently" as between 34% and 66%; and "Continuously" as 67% or greater. (*See* Stetz Dep. Ex. 6.)

On April 2, 2007, Susan Salsbury, an Ohio Health occupational therapist, performed an ergonomic assessment of the work stations in the RHC file room. (Salsbury Dep. 15–16.) As a

result of the assessment, modifications were made to the work stations in the file room, and

Carpenter was provided with a foot stool to aid in performing certain tasks and an ergonomic

chair. (*See* Carpenter Dep. 146–47.)

In April 2007, Dr. Stetz noticed some deterioration in Carpenter's condition, including

the presence of pain in Carpenter's lower back. (*See* Stetz Dep. 35–37.) Stetz later associated

the lower back pain with the hanging of mammography films. (Stetz Dep. 38–39.) Carpenter

began hanging the films between April 16th and April 20th as a result of Buchele's new

expectations for his position, and claims that doing so caused discomfort in his back, back

spasms, and inflamed internal hemorrhoids. (Carpenter Dep. 136–37.) Accordingly, on April

27th, Stetz asked Ohio Health to remove the hanging of the films from Carpenter's job duties for

a three month period. (Stetz Dep. Ex. 8.)

In May 2007, Salsbury performed a job task analysis of Carpenter's position. (Salsbury

Dep. 42.) As part of the analysis, her practice was to interview the employees performing the job

in question. (Salsbury Dep. 44.) In the job task analysis, she determined that hanging films is

something that is done "frequently to constantly." (Salsbury Dep. Ex. F. at 1.) She concluded

that hanging mammography films was an essential function of the Radiology Section

Coordinator position. (*See* Salsbury Dep. 14.) Buchele agreed with this conclusion. (*See*

Buchele Dep. 93.)

According to Buchele, she discussed with Carpenter whether his schedule could be

structured to avoid the processing station (where films were hung), with the understanding that

he would still need to hang the films enough times to maintain his skill given the possibility that

he would work as a closer in Joyce Burris's absence. (Buchele Dep. 153; *see* Salsbury Dep. Ex.

C.) Buchele testified that Carpenter rejected this option. (Buchele Dep. 153.) She also testified

that, through this arrangement, he would still have required the stamina to hang films more often than one out of every four hours if, on a particular day, a large number of films had to be positioned between 5 p.m. and 7 p.m. (Buchele Dep. 154.)

Ohio Health has an employment policy titled "Accommodated Work Program" the stated purpose of which is "[t]o establish guidelines for providing accommodated work arrangements for associates who are unable to perform their normal job duties due to a temporary medical condition." (Carpenter Dep. Ex. 10.) As the April 27, 2007 restriction preventing Carpenter from hanging mammography films was temporary, Ohio Health contends that Carpenter came within the terms of this policy.

On July 16, 2007, Stetz issued revised restrictions on Carpenter's physical activities that were nearly identical to the restrictions made effective on March 14th. (Stetz Dep. Ex. 10.) However, on the form detailing the restrictions, Stetz noted that "[t]rial period of standing while hanging mammograms is a good idea." (Stetz Dep. Ex. 10.) Following receipt of the revised restrictions from Dr. Stetz, Salsbury worked with Carpenter to help him perform the task of hanging the films in an ergonomically sound manner. (*See* Salsbury Dep. 22–24.)

On September 11, 2007, Salsbury worked with Carpenter to complete a Transitional Work Initial Evaluation. (*See* Salsbury Dep. Ex. B.) According to Salsbury, transition work is part of Ohio Health's accommodated work program, and is designed to transition employees from temporary restricted work to unrestricted work. (*See* Salsbury Dep. 24.) The purported goal of the transitional work plan was to gradually increase Carpenter's tolerance for hanging the films without pain until he could meet the requirements of his position. However, Carpenter testified that as he progressed back to the position's full requirements, he began to experience back spasms that made it extremely uncomfortable for him to continue. (Carpenter Dep. 217–

18.) Salsbury testified that "he had tried for a month and was not able to increase the endurance

or tolerance for the repetitive forward reaching that was required to do the job demands."

(Salsbury Dep. 53.)

Carpenter then gave Salsbury permission to contact Dr. Stetz. (Salsbury Dep. 54.) After

Salsbury and Stetz discussed Carpenter's situation, Stetz faxed a letter to Salsbury on October

22, 2007 wherein he stated that

> [a]s we discussed by phone, [Carpenter] needs permanent job restrictions limiting
> the amount that he extends his body forward and upward. Hanging
> mammography studies falls into this category. I believe that he should be limited
> to one hour of this activity for every four hours that he is 'on the clock'.

(Salsbury Dep. Ex. D.) Stetz testified that this restriction prevented Carpenter from hanging the

mammography films for any two consecutive hours during his shift. (Stetz Dep. 67–68.)

On September 5, 2007, Carpenter asked Jon Joffe, Vice President of Human Resources,

to be accommodated through the removal of the hanging of the mammography films from his

position. (Carpenter Dep. 209–10.) Buchele testified that she attended a meeting which also

included Joffe and Salsbury to discuss the possible accommodation. At the meeting, Carpenter's

request was ultimately denied because Buchele considered hanging of the films to be an essential

part of Carpenter's position. (Buchele Dep. 92–93.) Carpenter also asked Joffe about the

possibility of being transferred to another position within Ohio Health. (Carpenter Dep. 210.)

Ohio Health asserts that, as Carpenter was permanently unable to perform an essential

duty of his position, and no reasonable accommodation was possible, Carpenter was ineligible

for the Accommodated Work Program. Accordingly, Plaintiff was placed on short term

disability and began working with Nancy Miller, an Ohio Work Program Accommodation

Specialist, to find a new position within Ohio Health. (Carpenter Dep. 261–62.) Ohio Health

has an employment policy titled "Leave of Absence," which provides employees up to six

months of a leave, but also states that "[i]f an associate is unable to return to work at the end of the maximum leave period, he/she is considered to have voluntarily resigned." (Carpenter Dep. Ex. 29.)

During the six months following his placement on short term disability, Carpenter applied for a total of eleven different positions with Ohio Health. (*See* Ponzio Am. Aff. ¶ 5.) Ohio Health represents that it does not give preference to individuals on medical leaves of absence in filling open positions within the company, but instead chooses the most qualified candidate. (Ponzio Am. Aff. ¶ 5.) Carpenter was selected to interview for the position of Electronic Imaging Technologist, but Ohio Health claims that a more qualified individual was selected for the position. (Ponzio Am. Aff. ¶ 9.) As he was unable to secure a new position within the company within six months, his employment with Ohio Health was terminated effective April 26, 2008. (Buchele Dep. Ex. V.)

### B.

Carpenter brings causes of action under the ADA, the Ohio antidiscrimination statute, and the ADEA. Specifically, he asserts the following claims: (1) In terminating his employment, Ohio Health discriminated against him because of his disability in violation of the ADA and the similar Ohio statute, O.R.C. § 4112.01 *et seq.*; (2) he was impermissibly denied requests for a reasonable accommodation that would have allowed him to perform the essential functions of his position in violation of the ADA and the Ohio statute; (3) that Carpenter was subject to retaliation after he requested a reasonable accommodation in violation of the ADA and Ohio statute; and (4) Carpenter was terminated because of his age in violation of the ADEA and the similar Ohio statute, O.R.C. § 4112.01 *et seq.*

Presently pending before the Court are Ohio Health's motion for summary judgment; Carpenter's motion for summary judgment; Carpenter's motion for leave to file supplemental authority; Carpenter's motion for summary judgment regarding Ohio Health's mitigation of damages defense; and Carpenter's motion to strike the affidavit of Emmalee Ponzio. Ohio Health seeks summary judgment on each of Carpenter's claims while Carpenter only seeks summary judgment on his claims for disability discrimination and failure to accommodate, and on the issue of damages mitigation. The Court first considers Carpenter's motion to strike Ponzio's affidavit.

## II.

In her affidavit, Ponzio avers that she was an employment specialist tasked with working with Carpenter to find a new position at Ohio Health after he was placed on short term disability. (Ponzio Am. Aff. ¶ 5.) She further avers that Carpenter was not selected to any position to which he applied because a more qualified individual was selected in his place. (Ponzio Am. Aff. ¶ 6.) According to Ponzio, the statements in the affidavit are based on personal knowledge. (Ponzio Am. Aff. ¶ 1.) Pursuant to Rule 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). Carpenter initially moved to strike Ponzio's affidavit on the grounds that it was not based on personal knowledge and that it contained inadmissible hearsay. (*See* Doc. 45.) In response, Ohio Health submitted an amended affidavit, which Carpenter contends should be stricken because it attempts to present expert testimony disguised as lay testimony where Ponzio was not properly identified as an expert witness. (*See* Doc. 53.)

The Court declines to strike the affidavit.  On its face, the affidavit purports to be based on Ponzio's personal knowledge.  She also claims that she worked with Carpenter in helping him find a new position.  Carpenter's assertion that the affidavit simply cannot be based on personal knowledge is not supported by any evidence to the contrary.  Further, Carpenter has not refuted Ohio Health's contention that Ponzio was identified as a fact witness and that he otherwise had the opportunity to depose her, but declined to do so.

### III.

### A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that

the court must draw all reasonable inferences in favor of the nonmoving party and must refrain

from making credibility determinations or weighing evidence).  Furthermore, the existence of a

mere scintilla of evidence in support of the nonmoving party's position will not be sufficient;

there must be evidence on which the jury reasonably could find for the nonmoving party.

*Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also*

*Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or

implausible inferences to be insufficient to survive summary judgment).

  Here, the Parties have filed cross-motions for summary judgment.  Each party, as a

movant for summary judgment, bears the burden of establishing that no genuine issue of material

fact exists and that he or it is entitled to a judgment as a matter of law. The fact that one party

fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that

the opposing party or parties has satisfied the burden and should be granted summary judgment

on the other motion.  In reviewing cross-motions for summary judgment, courts should "evaluate

each motion on its own merits and view all facts and inferences in the light most favorable to the

non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).  "The filing of

cross-motions for summary judgment does not necessarily mean that the parties consent to

resolution of the case on the existing record or that the district court is free to treat the case as if

it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*,

929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. &*

*Univs.*), 757 F.2d 698, 705 (5th Cir.1985)).  The standard of review for cross-motions for

summary judgment does not differ from the standard applied when a motion is filed by one party

to the litigation. *Taft Broad.*, 929 F.2d at 248.

**B.**

As an initial matter, the Court grants Carpenter's Motion for Leave to File Supplemental Authority to Plaintiff's Motion for Summary Judgment (Doc. 40), and will consider the authority cited therein.

**C.**

Carpenter's claims that he was terminated because of his disability, that he was denied a reasonable accommodation, and that he was retaliated against for seeking a reasonable accommodation are all brought pursuant to both the ADA and the Ohio antidiscrimination statute, O.R.C. § 4112.01 *et seq.* However, because of the similarity of these statutes, Ohio courts look to regulations and cases interpreting the ADA for guidance in interpreting the Ohio statute. *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206–07 (Ohio 1998). Accordingly, the Court will analyze Carpenter's disability claims under regulations and case law expounding the ADA. Additionally, as the events giving rise to Carpenter's claims occurred before the January 1, 2009 effective date of the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 ("ADAAA"), and the ADAAA does not apply retroactively, the Court will apply the standards in place prior to enactment of the ADAAA. *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009).

**1.**

Carpenter argues that Ohio Health impermissibly terminated him because of his disability. Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Here, the Parties do not

dispute that Carpenter's claim is based on direct evidence that Ohio Health decided to remove

Carpenter from the Radiology Section Coordinator position because of an alleged disability.

Accordingly, in order to prevail on his claim, Carpenter has the burden of proving that he is

disabled and that he is qualified for the position despite his disability either without

accommodation, with an alleged essential job function eliminated, or with a proposed reasonable

accommodation. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004). If

Carpenter meets his burden, Ohio Health must prove that the challenged job function is essential

or that the proposed accommodation will impose an undue hardship. *Id.*

The Parties both assert that they are entitled to summary judgment on the issues of

whether Carpenter is disabled within the terms of the ADA and whether hanging the

mammography films was an essential function. As explained below, the Court concludes that

material factual disputes exist on both of these issues.

**a.**

The ADA defines "disability" as "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (2006).

Prior to passage of the ADAAA, the ADA was to be "interpreted strictly to create a demanding

standard for qualifying as disabled." *Toyota Motor Mfg., Ky., Inc.*, 534 U.S. 184, 197 (2002)

(abrogated in part by the ADAAA). The Parties do not dispute that Carpenter suffers from an

impairment, but Ohio Health challenges whether that impairment substantially limits any major

life activities and whether Ohio Health regarded him as disabled.

Carpenter alleges that he is substantially limited as to the major life activities of

exercising, lifting, performing manual tasks, sleeping, sitting, reaching, bending, standing, and

working. In the alternative, he alleges that Ohio Health regarded him as disabled. As an initial matter, Carpenter has not adduced evidence tending to establish that he is substantially limited in his ability to exercise. Accordingly, summary judgment is granted to Ohio Health as to that potential disability.

The term "substantially limits" in defined in 29 C.F.R. § 1630.2 to mean "unable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (2007). In determining whether an individual is substantially limited as to a major life activity, the "[t]he nature and severity of the impairment," "[t]he duration or expected duration of the impairment," and "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment" should be considered. *Id.* § 1630.2(j)(2).

### i.

Turning first to whether Carpenter is substantially limited in his ability to sleep, the Court concludes that Carpenter has failed to produce evidence from which a reasonable jury could find in his favor as to this aspect of his disability discrimination claim. As evidence of his problems sleeping, Carpenter cites Salsbury's testimony that he informed her that he was having problems staying asleep, that he awoke at 3:30 or 4:30 in the morning, and that his sleep was otherwise interrupted. (Salsbury Dep. 33.) Further, Dr. John Adams, Carpenter's family doctor, reported that Carpenter was having difficulty staying asleep and was given samples of a sleep medication. (Adams Dep. 24, 42.) After being given the samples, however, Carpenter never requested a

prescription for the medication.  (Adams Dep. 43.)  Ohio Health notes that Carpenter admitted

that his sleep problems were "mostly limited" to 2007.  (Carpenter Dep. 355.)  This evidence is

simply insufficient to establish that Carpenter was significantly limited in his ability to sleep.

For instance, lacking from this evidence is any indication of the actual length of time he was able

to sleep.  *See Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001) ("While less

than five hours sleep is not optimal, it is not significantly restricted in comparison to the average

person in the general population.").  Further, as Carpenter testified that his sleeping problems

were mostly limited to 2007, the duration of the impaired sleep was relatively short.

ii.

Carpenter also argues that he is substantially limited in his ability to work.  With regard

to the major life activity of working, federal regulations provide that substantially limited means

> significantly restricted in the ability to perform either a class of jobs or a broad
> range of jobs in various classes as compared to the average person having
> comparable training, skills and abilities. The inability to perform a single,
> particular job does not constitute a substantial limitation in the major life activity
> of working.

29 C.F.R. § 1630.2(j)(3) (2007).  The regulations also provide the following three factors to

consider in determining if an individual is substantially limited as to his or her ability to work:

> [1] The geographical area to which the individual has reasonable access;
>
> [2] The job from which the individual has been disqualified because of an
> impairment, and the number and types of jobs utilizing similar training,
> knowledge, skills or abilities, within that geographical area, from which the
> individual is also disqualified because of the impairment
> (class of jobs); and/or
>
> [3] The job from which the individual has been disqualified because of an
> impairment, and the number and types of other jobs not utilizing similar training,
> knowledge, skills or abilities, within that geographical area, from which the
> individual is also disqualified because of the impairment (broad range of jobs in
> various classes).

*Id.*

On October 31, 2007, Dr. Stetz completed an Ohio Health form titled "Disabilities and Reasonable Accommodation Policy Documentation of Disability/Functional Limitations." In this form, Stetz noted the following limitations for Carpenter:

- Rarely lift between 76 and 100 pounds;

- Infrequently reach overhead, crouch/stoop, and lift between 51 and 75 pounds;

- Occasionally bend over, climb, push/pull, and lift between 26 and 50 pounds;

- Frequently sit, stand, walk, kneel, lift up to 25 pounds, repeatedly use both hands, lightly grasp with both hands, and firmly grasp with both hands;

- Constantly repeatedly use either his left or right hand, lightly grasp with either his left or right hand, firmly grasp with either his left or right hand, and perform fine motor skills with either his left or right hand.

(Stetz Dep. Ex. 16 at 1.) In the document, the term "occasionally" is defined to include 6% to 33% of task, 3 to 12 repetitions per hour, or 21 to 100 repetitions per day. (Stetz Dep. Ex. 16 at 1.) The term "frequently" is defined to include 34% to 66% of task, 13 to 30 repetitions per hour, or 101 to 245 repetitions per day. (Stetz Dep. Ex. 16 at 1.) In the functional limitations document, Stetz also certified that Carpenter was substantially limited in his ability to perform manual tasks and work. (Stetz Dep. Ex. 16 at 1.) When asked to clarify at his deposition, however, Stetz testified that he did not believe that Carpenter was unable to work in general, but only that the restriction on hanging films prevented him from working as a Radiology Section Coordinator. (Stetz Dep. 76–77.)

In addition to Dr. Stetz's certification, Carpenter generally claims that the cumulative effects of his difficulties with bending, lifting, standing, performing manual tasks, and sitting render him disabled as to his ability to work. These general contentions, however, are insufficient for a jury to find that he is substantially limited in his ability to work. Carpenter has

adduced no evidence addressing the three factors identified in 29 C.F.R. § 1630.2(j)(3) (2007) such as the geographic area to which he has access, the number and types of jobs he is precluded from performing, or his specific training and qualifications. This is the type of evidence that would allow a jury to determine whether Carpenter is significantly restricted in his ability to work compared to others of similar training and experience.

Additionally, Carpenter's contention that he is disabled as to working is contradicted by the fact that he testified that, at least in 2008, he was able to work. (*See* Carpenter Dep. 45.) Carpenter was able to successfully perform every aspect of the Radiology Section Coordinator position except for the hanging of the mammography films. For these reasons, the Court concludes that the record does not support a potential finding that Carpenter's general ability to work is substantially limited.

### iii.

The Court similarly concludes that Carpenter has failed to create an issue of material fact as to whether he is substantially limited in his ability to stand and sit. Carpenter testified that because of his conditions, he is unable to sit for more than three hours or more without having "to get up and move around." (Carpenter Dep. 309.) He also testified that he could sit five hours out of an eight hour work day. (Carpenter Dep. 313.) With regard to standing, Carpenter stated that he can stand for an hour in one place before feeling the need to either sit or walk to relieve his discomfort. (Carpenter Dep. 309–10.) Further, Carpenter notes that the restrictions imposed by Stetz (at least at certain times) required him to change position from sitting or standing or vice versa five minutes out of every hour. (Stetz Dep. Ex. 6.) It is undisputed that Carpenter can stand in one place for an hour at a time and sit for up to three hours, which is not significantly different from an average person and does not constitute a substantial limitation.

iv.

The Supreme Court has held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Mfg.*, 534 U.S. at 198. Examples of activities of central importance in daily life include household chores, bathing, and brushing teeth. *Id.* at 202. When asked to describe what manual tasks he is limited in performing, Carpenter stated:

> I have trouble like with washing my car or waxing my car. I only do a little bit at a time. I can do the top okay. But when I go to wash the sides of the car or wax it, I usually do—I can do the top easy enough, but the bending and stooping required like in waxing an automobile, I usually do just one part at a time. I'll do one piece one day and then I'll do another part the next day. Instead of doing it all at once, I have to break it up. I notice that like washing dishes, I can wash dishes for a certain amount of time. And then after a certain amount of time, I start to experience back spasms. So I just try not to let them pile up.

(Carpenter Dep. 307.)

While washing dishes could easily be considered a household chore, it is unclear whether washing or waxing a car can likewise be considered an activity of central importance to most people's daily lives. However, as with the major life activities previously discussed, Carpenter has failed to produce evidence to establish that he is substantially limited in his ability to perform manual tasks. With regard to washing or waxing his car, even assuming that this could be considered a manual task as that term was delineated by the Supreme Court in *Toyota*, the above-cited testimony establishes that Carpenter must take breaks between different segments of the activity, but is otherwise able to complete the tasks involved. This fact thus undermines any possible conclusion that Carpenter is severely restricted in his ability to wash or wax his car. With regard to washing dishes, the phrase "certain amount of time" is too imprecise and vague to

allow the prerequisite comparison between Carpenter and an average person. Thus no reasonable jury could conclude that Carpenter is severely restricted in his ability to wash dishes.

v.

The Court next considers the major life activities of reaching, bending, and lifting. As explained below, material issues of fact exist with regard to these activities that must be resolved by a jury. Carpenter testified at length during his deposition concerning his ability to reach and bend as follows:

> Reaching forward and up can be difficult. But bending forward over an extended period of time caused me to have back discomfort.
>
> Q. Just bending forward for an extended period of time is what you're saying?
>
> A. Bending forward over an extended period of time.
>
> Q. What's an extended period of time?
>
> A. I noticed that if I bend forward for more than— you know, over, say, four or five minutes, for me I start to experience back discomfort and it's hard to straighten back up. It causes me to have a lot of back discomfort in my mid thoracic, you know, the middle of my back when I extend forward or bend down for extended periods of time.
>
> Q. So that's what I'm trying to figure out, what you mean by extended period of time. So you said if you bend forward for four or five minutes you start to—
>
> A. If I had to lean over into an automobile to fix something on an engine, that bending and leaning forward over an extended period of time causes me back discomfort. I mean, I've noticed that after a period of about five minutes if I'm really bending forward, I will experience some back spasm [sic].

(Carpenter Dep. 307–09.) Additionally, in an employee health and wellness progress report completed by Salsbury in October 2007, Carpenter reported pain ranging between three and nine on a scale of one through ten. (Doc. 43-4.) Dr. Adams testified that during an April 2007 visit, Carpenter reported pain levels of between seven and eight on a scale of ten. (Adams Dep. 29.)

The Court also notes that the record contains substantial evidence indicating that the task

20

of hanging mammography films, which requires both reaching and bending, aggravated

Carpenter's back injury and caused back spasms.  Taken together, this evidence suggests that

after bending for only five minutes, Carpenter has difficulty straightening up, and can experience

extremely painful back spasms.  Thus, from this evidence, a reasonable jury could conclude that

Carpenter is disabled based on a substantial limitation of his ability to bend or reach.  Other

evidence in the record could suggest that Carpenter may not be severely restricted in his ability

to bend or reach.  Per the permanent restrictions issued by Dr. Stetz, Carpenter was able to hang

mammography films continuously for up to an hour and cumulatively for up to two hours during

the workday. (Stetz Dep. Ex. 14.)  Accordingly, a jury could find that the ability to perform this

task for an hour is inconsistent with a substantial limitation as to reaching or bending.  This issue

must be decided by a jury.

Additionally, on the functional limitation form completed by Stetz on October 31, 2007,

Stetz stated that Carpenter could "occasionally" bend over.  (Stetz Dep. Ex. 16.)  The term

occasionally is defined to include a range of possibilities, e.g. 6%–33% of the time, 3 to 12

repetitions per hour, and 21 to 100 repetitions per day.  A jury could or could not find that

Carpenter's limitation is within the higher realm of these ranges which would undermine the

conclusion that he is substantially limited.  For these reasons, a material issue of fact exists

regarding whether Carpenter is substantially limited in his ability to bend and reach.

Similarly, the record also contains an issue of material fact as to whether Carpenter is

substantially limited with regard to lifting.  Per the functional limitations form, Carpenter can

rarely life between 76 and 100 pounds; infrequently lift between 51 and 75 pounds; occasionally

lift between 26 and 50 pounds; and frequently lift up to 25 pounds.  "Frequently" includes ranges

of 34% to 66%, 13 to 30 repetitions per hour, or 101 to 245 repetitions per day.  On one hand, a

21

jury could conclude that the ability to lift twenty-five pounds only thirteen times per hour would significantly depart from what an average person is capable. On the other, lifting twenty five pounds 245 times in a day may far exceed the capabilities of this same, average person.

**vi.**

Finally, Carpenter claims that Ohio Health regarded him as disabled. An individual can be disabled under the "regarded as" prong of the definition if "(1) [an employer] mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999) (partially abrogated by the ADAAA). "It is not enough [] that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Ross v. Campbell Soup Co.*, 237 F.3d 701 (6th Cir. 2001) (quoting *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)). Based on this standard, Carpenter has failed to produce evidence to establish a "regarded as" disability.

In support of his regarded as argument, Carpenter points to instances in the record in which employees of Ohio Health referred to his condition as a disability. For instance, Carpenter points out that he was subject to an integrated "disability" management plan. (*See* Salsbury Dep. 13.) He also notes that Buchele mentioned the word disability during her deposition several times. (Buchele Dep. 90, 91, 92.) Further, Buchele received an email from Carpenter on October 24, 2007, stating that Nancy Miller informed him that "[y]ou cannot accommodate my disability because I cannot hang mammograms." (Buchele Dep. Ex. T.) Additionally, Nancy Miller was a "disability caseworker." (*See* Buchele Dep. 90.) Finally, Carpenter claims that Ron

Becker, who interviewed him for the Electronic Imaging Technologist position asked him about why he was on short term disability and about his back "disability," and further expressed some concern about Carpenter's back. (Carpenter Dep. 283.) Carpenter further testified that Miller told him that Becker may not have offered him the position out of concerns for his back disability. (Carpenter Dep. 288.) However, Carpenter acknowledged that Miller, who was not a decision maker, may have been only speculating as to why he was not offered the job. (Carpenter Dep. 289.) Stetz testified that Salsbury told him that if permanent restrictions were put in place, Ohio Health might not be able to keep Carpenter as an employee. (Stetz Dep. 58.)

The facts that Nancy Miller was called a disability caseworker, that Carpenter fell within the terms of a disability management policy, or that Salsbury told Stetz that permanent restrictions might prevent Ohio Health from retaining Carpenter do not support a finding that Ohio Health believed that Carpenter's impairment substantially limited a particular major life activity. Mere reference to his condition as a disability, a legal term of art under the ADA, does not satisfy the "regarded as" language of the ADA, particularly those references not made by the decision makers as to Carpenter's termination. Thus, the record does not support a finding by a jury that Ohio Health believed that Carpenter was disabled within the meaning of the ADA.

**b.**

The next issue disputed by the Parties is whether the hanging of mammography films is an essential function of the Radiology Section Coordinator position. This issue is relevant to Carpenter's disability discrimination claims in several ways. First, having established that a reasonable jury could find that he is disabled within the meaning of the ADA, Carpenter must prove that he is qualified for the position either with a reasonable accommodation or if the alleged essential function of hanging the films is removed. Second, if Carpenter is able to do so,

then the burden would shift to Ohio Health to prove that hanging the films actually is essential to

the position.  Additionally, as explained in Part III.C.2 *infra*, the essential function issue is

closely intertwined with Carpenter's claims that Ohio Health failed to reasonably accommodate

his disability.

29 C.F.R. § 1630.2(n) specifies the following with regard to an essential function:

(n) Essential functions — (1) In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n) (2007).

Here, a material issue of fact exists as to whether hanging the films is an essential function of the Radiology Section Coordinator position. Some evidence supports a finding in support of Ohio Health, including its judgment and the amount of time required to perform the task. Buchele believed that hanging mammography films was an essential function of the Radiology Section Coordinator position. (*See* Buchele Dep. 93.) Salsbury also testified that it was her assessment that hanging the films was an essential function. (*See* Salsbury Dep. 14.) Relatedly, Salsbury's job task analysis states that hanging films is something that is done "frequently to constantly." (Salsbury Dep. Ex. F. at 1.)

Additionally, according to Buchele, as the closers were the only two individuals working in the file room past 5 p.m., they were required to hang mammography films that had not been hung prior to 5 p.m. (*See* Buchele Dep. 125.) Ohio Health contends that, if Joyce Burris were absent, as the other closer, Carpenter would have to ensure that the remaining films were hung by the end of the shift. (*See* Carpenter Dep. 253.) Finally, Carpenter testified that between May 2004 and May 2007, Burris, Savage, and Griffin collectively spent fifteen hours per day hanging mammography films. (Carpenter Dep. 391–92.) That amount of time—five hours per person per day—is not insubstantial and would support the conclusion that hanging the films was a major component of the position.

Other evidence, however, supports a finding that hanging the films was not an essential function. Burris testified that even on the busiest days, the personnel working in the file room would collectively spend three hours or less hanging films. (Burris Dep. 15.) According to her, hanging of the films was not a highly specialized activity, there were no complaints of films not

being hung in a timely manner, and any films not hung by the close of business would simply be hung the next morning. (Burris Dep. 16–17.) She further testified that the necessity for hanging leftover films the next day only occurred about once per year. (Burris Dep. 17.) She characterized the hanging of the films as a minor part of the job and testified that the Radiology Section Coordinator position was not created for the sole purpose of hanging films. (Burris Dep. 24.) This testimony tends to undermine Ohio Health's position that hanging the films took substantial amounts of time or that there was urgency or importance in ensuring that all films were hung by the end of each day. Burris's testimony also casts doubt on Ohio Health's assertion that it could not work around Carpenter's limitations by excusing him from hanging the films.

Carpenter also adduces evidence critiquing the methodology employed by Salsbury in determining that hanging the films was essential. For instance, Salsbury testified that she relied on information received from Buchele as to how many films were hung on a daily basis, as opposed to actually counting. (*See* Salsbury Dep. 50.) Moreover, both Salsbury and Buchele testified that they did not know specifically how long it takes to hang a film, concluding that the time would vary depending on the proficiency of the employee and other factors. (Salsbury Dep. 60; Buchele Dep. 59.) Finally, Salsbury stated that her analysis of the frequency with which films had to be hung did not take into consideration the fact that multiple employees were tasked with hanging the films. (*See* Salsbury Dep. 61.)

Accordingly, as the above-cited evidence could be used to reasonably support a conclusion that hanging the films either was or was not an essential function of the Radiology Section Coordinator Position, a material issue of fact exists that must be resolved by a jury.

**2.**

A covered entity violates the ADA and Ohio antidiscrimination statute by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A) (2006). Pursuant to the Equal Employment Opportunity Commission's regulations, a reasonable accommodation is defined as:

> (i) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or
>
> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1) (2007). A reasonable accommodation may include:

> (i) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

*Id.* § 1630.2(o)(2).

Carpenter brings claims against Ohio Health for failing to accommodate his disability. Specifically, he alleges that he requested three accommodations: 1) eliminating the hanging of mammography films from his job duties; 2) limiting the hanging of film to one hour out of every

27

four per Dr. Stetz's letter of October 22, 2007; and 3) relocation to another position at Ohio Health. In order to establish a prima facie case of disability discrimination based on failure to accommodate, Carpenter must establish that he is disabled; he is qualified for the Radiology Section Coordinator position with or without an accommodation; that Ohio Health knew about his disability; that he requested an accommodation; and that the Ohio Health failed to provide an accommodation. *Myers v. Cuyahoga Cnty.*, 182 F. App'x 510, 515 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). If Carpenter can establish the prima facie case, the burden shifts back to Ohio Health to prove that any possible accommodation would have imposed an undue hardship. *Id.* at 515–16.

The Court has already determined that material issues of fact exist as to whether Carpenter is disabled. Further, evidence in the record supports a finding that Carpenter was qualified for the position, as he was able to perform all of the job duties other than hanging mammography films, that Ohio Health knew about his purported disability, that he requested an accommodation, and that his request was denied. The Court has also determined that material issues of fact exist as to whether hanging the mammography films is an essential function of the Radiology Section Coordinator position. As noted by Ohio Health, employers are not required to shift essential job functions to other employees in order to accommodate an individual's disability. *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000). Accordingly, at least as to Carpenter's requested accommodations of eliminating the hanging of the films from his position and limiting the time spent performing this task, material issues of fact exist that preclude a grant of summary judgment to either party. For instance, assuming that Carpenter succeeds in proving his prima facie case to the jury, Ohio Health could defeat his claim by prevailing on the essential function issue. In contrast, if hanging the films is not an

essential function, Carpenter's requests to eliminate or limit the requirement that he hang films would likely be reasonable and not present an undue burden on Ohio Health, especially if Burris's testimony is credited by the jury.

Turning to Carpenter's request that he be transferred to another position, as noted above, reassignment to a vacant position is recognized as a possible reasonable accommodation by the ADA. *See* 29 C.F.R. § 1630.2(o)(2)(ii) (2007). The Sixth Circuit has held that, while

> an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified[,] . . . [e]mployers are not required to create new jobs, displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual.

*Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000). The record is undisputed that Carpenter applied for eleven different positions within Ohio Health prior to his termination but was not selected for any of them. Further, Emmalee Ponzio, the employment specialist who worked with Carpenter in finding a new position after he was placed on short term disability, avers that, in each instance, a better-qualified individual was selected for the positions in question instead of Carpenter. Carpenter has adduced no evidence to refute Ponzio's averments, but instead attacks the sufficiency of her affidavit. However, in Part II *supra*, the Court declined to strike the affidavit. Accordingly, as Ponzio's affidavit is uncontradicted, regardless of whether the burden of proof lies with Carpenter or Ohio Health on the question of whether better-qualified individuals actually were selected over Carpenter, summary judgment must be granted to Ohio Health on Carpenter's claim of failure to accommodate him in the form of a job transfer.

**3.**

Ohio Health next asserts that it is entitled to summary judgment on Carpenter's claim that it retaliated against him for requesting a reasonable accommodation. The Court agrees. "To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). If Carpenter can establish a prima facie case, then the burden shifts to Ohio Health to articulate legitimate, nondiscriminatory bases for the adverse employment actions. *Id.* Carpenter bears the ultimate burden of establishing that the proffered reasons were merely a pretext for discrimination. *Id.*

Here, even assuming that Carpenter can establish his prima facie case, he simply has failed to adduce evidence that Ohio Health's stated legitimate reasons for taking the complained of adverse actions were pretextual. Carpenter alleges that he was denied other positions at Ohio Health, was subjected to verbal discipline, and ultimately terminated because of protected activity. He alleges that Ohio Health's stated reasons for terminating him, disciplining him, and for not selecting him are false, but offers no specific evidence in support of these allegations. For instance, he has cited no evidence tending to refute the stated reasons for his discipline and no evidence concerning the circumstances of his non-selection for certain positions. Moreover, he has produced no evidence to contradict Ohio Health's position that it placed him on leave and ended his employment because he could not perform what Ohio Health believed was an essential function of his position. As such, no reasonable jury could find in his favor on this issue as his position is based purely on conjecture. A mere scintilla of evidence is insufficient to carry Carpenter's burden in responding to Ohio Health's motion for summary judgment.

**D.**

Carpenter brings claims for age discrimination under both the ADEA and the Ohio antidiscrimination statute. The Court analyzes both of these claims under the framework applicable to the ADEA. *See Hidy Motors, Inc. v. Sheaffer*, 916 N.E.2d 1122, 1127 (Ohio Ct. App. 2009) ("The Ohio Supreme Court generally follows the analytic framework established by federal case law for use under the [ADEA] in interpreting and deciding age-discrimination claims brought under R.C. 4112.02."). The ADEA protects individuals forty years of age or older and prohibits an employer from discharging or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. §§ 623(a)(1); 631(a). It is undisputed that Carpenter was over forty years of age at the time of the events giving rise to this lawsuit.

To succeed on an ADEA claim, a plaintiff must show that age was the "but for" cause of an adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 n.4 (2009). A plaintiff may use direct or circumstantial evidence to do so. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009). A plaintiff may establish a prima facie case under the ADEA by demonstrating: (1) membership in a protected class; (2) adverse employment action; (3) qualifications for the previous position; and (4); replacement by a substantially younger employee. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008). Similar to Carpenter's retaliation claim, if he can establish a prima facie case of age discrimination, the burden shifts to Ohio Health to articulate legitimate, nondiscriminatory reasons for the adverse employment action. *Id.* The burden then shifts back to Carpenter to establish pretext. *Id.*

As with Carpenter's retaliation claim, even assuming that he can establish a prima facie case of discrimination, summary judgment is warranted on Carpenter's age discrimination claim

because Carpenter has not adduced sufficient evidence of pretext. The record is undisputed that Ohio Health has articulated a legitimate reason for terminating Carpenter's employment. Again, Carpenter generally asserts that Ohio Health's reason for terminating him is untrue. However, even if this is the case, he has adduced no evidence that the actual reason for his termination was because of his age or that the employer's proffered reason was false. To the contrary, he testified that he does not recall anyone at Ohio Health making any comments about his age during the time period at issue in this lawsuit. (Carpenter Dep. 315–16.) Accordingly, no reasonable jury could find in his favor on his age discrimination claims and they are therefore dismissed.

E.

Finally, the Court considers Plaintiff's motion for partial summary judgment on the issue of damage mitigation. The Parties do not dispute that a plaintiff in Carpenter's position has a duty to mitigate the damages suffered as a result of lost employment by attempting to find new employment. Nor do the Parties dispute that the burden is on Ohio Health to establish this affirmative defense. *See Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983). Ohio Health "may satisfy [its] burden only if [it] establishes that: 1) there were substantially equivalent positions which were available; and 2) [Carpenter] failed to use reasonable care and diligence in seeking such positions." *Id.* at 624.

Carpenter contends that Ohio Health lacks sufficient evidence to meet its burden. In response, Ohio Health points to Carpenter's testimony that he waited over two months before applying for a new position at the company following his placement on short term disability. (*See* Carpenter Dep. 276–77.) Ohio Health also has submitted an affidavit of Nancy Miller in which she avers that Carpenter was highly selective as to what positions for which he would apply and that he refused to apply for comparable positions for which he was qualified that were

32

suggested to him by her. (Miller Aff. ¶¶ 5–6.) This evidence is sufficient to create a material issue of fact relating to mitigation. Moreover, as the applicable standard is essentially one of reasonableness, determination of the issue of mitigation is best left to a jury.

IV.

For the foregoing reasons Plaintiff's Motion for Leave to File Supplemental Authority to Plaintiff's Motion for Summary Judgment (Doc. 40) is **GRANTED**; Defendant's Motion for Summary Judgment (Doc. 37) is **GRANTED in PART** and **DENIED in PART**; Plaintiff's Motion for Summary Judgment (Doc. 38) is **DENIED**; Plaintiff's Motion for Partial Summary Judgment Regarding Defendant's Mitigation of Damages Affirmative Defense (Doc. 25) is **DENIED**; and Plaintiff's Motion to Strike Affidavit of Emmalee Ponzio (Doc. 45) is **DENIED**.

Plaintiff's age discrimination claims are dismissed. Further, issues remaining to be tried include whether Plaintiff is disabled based on substantial limitations of his ability to bend, reach, or lift; whether hanging mammography films is an essential function of the Radiology Section Coordinator position; whether Defendant impermissibly denied Plaintiff's request to be accommodated through the elimination from his position of the requirement that he hang films; whether Defendant impermissibly denied Plaintiff's request to be accommodated through limitations of his film hanging requirements; and the degree to which Plaintiff complied with his duty to mitigate damages.

**IT IS SO ORDERED**

9-30-2011
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**